UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPH A. BARKER, REGIONAL DIRECTOR OF REGION 13 OF THE NATIONAL LABOR RELATIONS BOARD, FOR AND ON BEHALF OF THE NATIONAL LABOR RELATIONS BOARD<br><br>Petitioner<br><br>v.<br><br>LABORERS LOCAL 118, AFL-CIO-CLC<br><br>Respondent | Civil No. 08CV3412<br><br>Judge Andersen<br>Magistrate Judge Cole |

**PETITIONER'S MEMORANDUM IN SUPPORT OF
TEMPORARY INJUNCTION UNDER
SECTION 10(l) OF THE NATIONAL LABOR RELATIONS ACT**

Section 10(l)[1] of the Act empowers district courts to grant "just and proper" injunctive relief pending the Board's resolution of unfair labor practice charges alleging certain enumerated unfair labor practices. Section 10(l) reflects the determination of Congress that these unfair labor practices, principally illegal picketing give, or tend to give rise to such serious interruptions to commerce as to require their prompt discontinuance, pending adjudication by the Board of their merits. This is to avoid irreparable injury to the policies of the Act, and the frustration of statutory purpose which would otherwise result. S. Rep. No. 105, 80th Cong., 1st Sess., pp. 8, 27 (1947), reprinted at *I Legislative History of the Labor Management Relations Act*, 414, 433 (Government Printing Office 1985); *Squillacote v. International Brotherhood of Teamsters, Local 344*, 561 F.2d 31, 35 (7th Cir. 1977); *Squillacote v. Graphic Arts Intl. Union (GAIU) Local 277*, 513 F.2d 1017, 1021, 1023 (7th Cir. 1975); *Kinney v. Pioneer Press*, 881 F.2d 485, 488 (7th Cir. 1989).

---

[1] Section 10(l) of the Act provides that in the case of petitions filed with respect to Section 8(b)(4)(D) "the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper . . .."

This petition seeks to temporarily enjoin Laborers Local 118 (herein called "Respondent"), a statutory labor organization, from engaging in unlawful picketing against Countryside Industries (herein called "Countryside"), pending final disposition of an unfair labor practice charge. This charge, Board Case 13-CD-773, is currently being processed, and a hearing to determine to whom the disputed brick paving work should be assigned is set for June 24, 2008, at which time all parties will have an opportunity to present evidence. From this transcript, the Board will decide if there is a reasonable cause to believe that Section 8(b)(4)(D) has been violated and if so, to whom should the work be assigned. This petition for injunctive relief, however, is predicated on Petitioner's conclusion that there is both reasonable cause to believe, as well as a likelihood of success on the merits of the administrative proceeding before the Board, that Respondent has engaged in unlawful picketing proscribed by Section 8(b)(4)(i)(ii)(D) of the Act, 29 U.S.C. Sec 158(b)(4)(i)(ii)(D), and refuses to provide assurances that it will not continue to threaten to engage in these same unfair labor practices in the future.

Petitioner contends that granting a temporary injunction is just and proper under traditional equitable criteria.[2] The gravamen of the complaint in this case is Respondent's attempts to force reassignment of brick paving work from one company (Countryside) to another (Ragnar Benson LLC, herein called "Ragnar Benson.") Simply put, Respondent wants the work for its members and is attempting to achieve this goal through illegal picketing or threats to picket. The subtext to this dispute is that Respondent hopes that the Board's processes will be lengthy and if it can apply economic pressure now, while the Board deliberates, Respondent can get the work for its members or injure the parties involved to such an extent that their businesses, reputations, and goals will be destroyed. The destruction has impact for the businesses involved but also to the governmental agencies and residents of South Barrington, who will not receive the prompt tax revenues from this project but will endure delays in road construction and traffic light interruptions if this dispute erupts again. Lastly, there is impact to the wider

---

[2] As hereafter shown, having reached such conclusion, Petitioner is permitted by Section 10(l) of the Act to petition the Court for a temporary injunction against a continuation of the unfair labor practices or a refusal to issue assurances that it will not continue such acts.

labor community who must not assume that Section 10(l) of the Act is a hollow, impotent piece of legislation which need not be minded.

I. Respondent's Labor Dispute is Targeted at Forcing the Reassignment of Brick Paving Work To Its Members Through Picketing or Threats to Picket

The unfair labor practice charge underlying this petition centers around a labor dispute wherein Respondent is attempting to force the reassignment of brick paving work from Countryside to Ragnar Benson. Countryside is an Illinois corporation engaged in the business of a landscaping. Ragnar Benson is the general contractor of a project known as "The Arboretum"—a retail shopping development in South Barrington, Illinois. The Arboretum is the owner of the property and developer of the retail campus. Ragnar Benson's employees are members of Respondent, whereas Countryside's employees are members of the International Union of Operating Engineers, Local 150, and Teamsters Local 703.

As will be shown at the hearing, The Arboretum entered into an oral contract with Countryside to complete the installation of brick pavers on The Arboretum property. Tangentially related, Ragnar Benson, the general contractor, also entered into a contract with Countryside to complete landscaping construction services—specifically irrigation and well installation only—for The Arboretum property.

By letter dated March 24, 2008, Respondent made its first attempt to force the reassignment of work from Countryside to Ragnar Benson. In this letter, Respondent appeals to Ragnar Benson to be awarded the brick paver installation and specifically demands that Countryside be removed from the property. But having not achieved its goals on the first attempt, Respondent next filed a grievance a month later on April 22, 2008, against Ragnar Benson alleging that it had violated its agreement with Respondent by illegally subcontracting with Countryside. In this grievance, Respondent asserted that it was owed payment in lieu of work performed by Countryside for the brick paver work.

Ragnar Benson promptly responded to this grievance by letter dated April 23, 2008, and explained that it did not hold the contract for the brick paver work. Respondent ignored this information and instead commenced picketing against Countryside on May 19, 2008. The picket signs stated their dispute with Countryside was because Countryside employees "receive substandard wages and benefits."

Promptly on the heels of their investigation of the standards paid by Countryside, a picket line was established the next working day, Monday, May 19, 2008. As a result of the picketing, Ragnar Benson barred Countryside from coming to The Arboretum jobsite to perform the brick paving work. Since that time, Countryside has returned to complete limited assignments on The Arboretum jobsite and yet, Respondent has given no assurances that its illegal activity will not continue under its same faulty rationale. And, further demonstrating its flimsy rationale, it will be demonstrated that Respondent has not picketed Countryside at any of its other jobsite for the "substandard wages and benefits" accused of it by Respondent.

II. THE STATUTORY SCHEME PURSUANT TO WHICH INJUNCTIVE RELIEF IS SOUGHT: THE APPLICABLE STANDARDS

A. <u>Section 10(l) of the Act</u>

Section 10(l) requires that preliminary injunctions be sought wherever complaints alleging violations of Section 8(b)(4)(A), (B), (C), 8(b)(7) and 8(e), are issued but Section 10(l) proceedings in 8(b)(4)(D) cases are discretionary. If however, it is determined that there is a reasonable cause to believe a labor organization is engaging in conduct proscribed by Section 8(b)(4)(D) and that such conduct is continuing or likely to resume, Section 10(l) proceedings are warranted. This is true either where 10(k) proceedings are appropriate or when there is an all-party agreed-upon procedure for settling work assignment disputes. *Douds v. I.L.A.*, 242 F.2d 808 (2nd Cir. 1957); *Schauffler v. Local 420, United Association, etc.*, 218 F.2d 476, 481(3rd Cir. 1955).

Under current 7th Circuit law, in determining whether to issue an injunction under Section 10(l), the Court must apply a two-step inquiry. *Kinney v. International Union of Operating Engineers, Local 150*, 944 F.2d 1271, 1275 (7th Cir. 1993). First, the Court must assess whether the Board has reasonable cause to believe a work jurisdictional dispute has occurred or is occurring, thereby requiring the Board to seek an injunction. Second, the "just and proper" rubric of Section 10(l) requires the Court to apply the traditional four-part test in equity for determining whether injunctive relief is appropriate.

B. <u>The Reasonable Cause Standard</u>

Injunctive proceedings under Section 10(l), are ancillary to the main unfair labor practice case, and any injunctive issued thereunder is interlocutory in nature and expires upon the Board's rendering its final decision. *Sears, Roebuck & Co. v. Carpet Etc.*

*Layers, Local Union No. 419*, 397 U.S. 655, 658 (1970). Therefore, the district court is not called upon to decide the merits of the unfair labor practice case, that is, whether in fact a violation has occurred. That function, with respect to both fact and law, is reserved exclusively for the Board, subject to appellate court review pursuant to Section 10(e) and 10(f) of the Act, 29 U.S.C. 160(e) and (f). *Squillacote v. Local 248, Meat & Allied Food Workers,* 534 F.2d 735, 743 (7th Cir. 1976).

The Seventh Circuit has observed that "[t]he statutory standard of 'reasonable cause' is satisfied if there is a showing of factual issues which must be resolved by the Board. Section 10(l) commands the courts to disregard their traditional reluctance to issue preliminary injunctions where there is a substantial conflict in the evidence." *Squillacote v. Graphic Arts (Graphic Arts II)*, 540 F.2d 853, 858 (7th Cir. 1976). Where there are disputed issues of fact, the Petitioner should be given the benefit of the doubt. *Kinney v. Chicago and Northeast Illinois District Council United Brotherhood of Carpenters and Joiners of America*, 825 F. Supp. 843, 848 (N.D. Ill. 1993).

The "reasonable cause" standard does not require the Board to adduce evidence to the extent required for enforcement of a Board order, after a full hearing on the merits. Consequently, "the Regional Director faces a relatively insubstantial burden of proof when he petitions a district court for temporary injunctive relief pursuant to Section 10(l)." *Squillacote* at 858 (1976), quoting *Hirsch v. Building & Construction Trades Council,* 530 F.2d 298, 302 (3rd Cir. 1976).

C. The "Just and Proper" Standard

Interim injunctive relief is appropriate under Section 10(l) of the Act to prevent disruptions in the free flow of commerce, and to keep the Union from accomplishing its unlawful objectives before the Board can issue its order. *Squillacote v. Teamsters Local 344*, supra; *Squillacote v. Graphic Arts Intl. Union, Local 277,* 513 F.2d at 1023; *Union de Tronquistas de Puerto Rico, Local 901 v. Arlook,* 586 F.2d 872, 878 (1st Cir. 1978).

In determining whether injunctive relief is "just and proper," the Seventh Circuit requires district courts to apply general equitable standards for considering requests for preliminary injunctions. See *Kinney v. Pioneer Press,* 881 F.2d at 490-91; *Kinney v. IUOE Local 150,* 994 F.2d at 1275-78. Under these standards, the court must evaluate: 1) the likelihood that the petitioner will succeed on the merits; 2) whether the petitioner

has an adequate remedy at law and/or would be irreparably harmed if the injunction did not issue; 3) whether the threatened injury to petitioner outweighs the threatened harm an injunction would inflict on Respondent; and 4) whether the granting of a preliminary injunction serves the public interest. *Kinney v. IUOE Local 150*, 994 F.2d at 1275. In *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1568 (7th Cir. 1996), quoting *Kinney v. IUOE Local 150*, 994 F.2d at 1279, the Court held: "The Board will determine whether the Director has proven her case beyond a preponderance of the evidence. For our purposes, we must decide whether the Director has a better than negligible chance of success; whether the Director has 'some chance' of succeeding on the merits."

The greater the likelihood of success on the merits, the less the harm the petitioner need show in relation to the harm the respondent will suffer. See *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387-88 (7th Cir. 1984), cited in *Kinney v. IUOE Local 150*, 994 F.2d at 1275, fn. 5, for a definition of the appropriate standards.[3] "In other words, a strong showing…of likely success on the merits can offset a weak showing of harm." *NLRB v. Electro-Voice, Inc., supra*.

The evaluation of the Regional Director's likelihood of success on the merits is similar to a showing of reasonable cause. *Kinney v. IUOE Local 150*, 994 F.2d at 1278. Depending upon the balance of harms, the petitioner's chances of success need only be "better than negligible." *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d at 387. Conflicts in the evidence need not be resolved by the district court, whose "function is limited to a determination of whether contested factual issues could ultimately be resolved by the Board in favor of the General Counsel." *Squillacote v. Graphic Arts Intl. Union*, 540 F.2d at 860.

Where the Board's sole "remedy at law" is permanent injunctive relief under the statute, the concept of irreparable harm and absence of a remedy at law are synonymous: the inquiry is whether, in the absence of immediate relief, the alleged violation so disrupts or threatens to disrupt commerce that the respondent may achieve its unlawful

---

[3] Although the Seventh Circuit decision in *Local 150* might be read to suggest that this "sliding scale" analysis is used only in the "public agency" test, and that the test is applicable only to FTC cases, the Seventh Circuit routinely applies this sliding scale analysis in any preliminary injunction case where the petitioner has shown some likelihood of success on the merits and no adequate remedy at law/irreparable injury.

objective before the Board can resolve the case. *Squillacote v. Graphic Arts Intl Union, Local 277*, 513 F.2d at 1023. See also *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d at 386 (irreparable harm is that "harm that cannot be prevented or fully rectified by the final judgment after trial").[4]

In balancing the harms relevant to whether a Section 10(l) injunction is "just and proper" the emphasis is on the threatened injury to the public interest. *Pioneer Press*, 881 F.2d at 491, citing *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 744 (7th Cir. 1976). Congress, in its enactment of Section 10(l), made specific mention of Section 8(b)(4)(D) and by so doing showed special concern for the potential harmful effects for picketing where an object of such activity is to force or require the reassignment the work and "commands the courts to disregard their traditional reluctance to issue preliminary injunctions where there is a substantial conflict in the evidence." *Squillacote v. Graphic Arts Intl. Union*, 540 F.2d at 858, quoting *Wilson v. Milk Drivers, etc.*, 491 F.2d 200, 206 (8th Cir. 1974). Accordingly, if unfair labor practices encompassed by Section 10(l) of the Act are ongoing, or are likely to be resumed, an injunction will be appropriate.[5] *Squillacote v. Graphic Arts Intl. Union*, 540 F.2d at 859; *Squillacote v. Graphic Arts Intl Union, Local 277*, 513 F.2d at 1023; *Shore v. Building & Construction Trades Council of Pittsburgh*, 173 F.2d 678, 682 (3rd Cir. 1949). "No alternative kind of relief would ... [give] adequate recognition" to the legislative purpose of Section 10(l). *Squillacote v. Graphic Arts Intl. Union*, 540 F.2d at 859.

### III. REASONABLE CAUSE

#### A. There is Reasonable Cause to Believe that the Unfair Labor Practices Charged Affect Commerce within the Meaning of the Act.

The unfair labor practice charge filed alleges that Respondent has interrupted the business of, *inter alia*, Countryside, The Arboretum, and Ragnar Benson. It will be shown that Countryside has purchased and received goods, materials and services valued in excess of $50,000 in states other than the State of Illinois and Respondent has

---

[4] Board remedial orders, by nature, are always equitable – no "damages" are assessed, nor are punitive damages imposed. Rather, Board orders are limited to "make whole" remedies. The remedy at law discussed by the Seventh Circuit in *Local 150*, 994 F.2d at 1279-80, available to the individual employees whom the union attempted to discipline, has no relevance to Board proceedings.

stipulated that Countryside is now and has been at all material times herein an employer engaged in commerce within the meaning of Sections 2(2), (6) and (7) and the Act. Therefore, the belief that the unfair labor practices herein affect commerce within the meaning of the Act is plainly reasonable.[6]

   B. There is Reasonable Cause to Believe that Respondent's Conduct Violates Section 8(b)(4)(D) of the Act.

The belief that Respondent's conduct violates Section 8(b)(4)(D) of the Act is reasonable. Section 8(b)(4)(D) of the Act prohibits labor organizations from picketing employers where an object of such picketing is to force or require an employer to assign particular work to employees in a particular labor organization, trade, craft or class, rather than to employees in another labor organization, trade, craft or class. Under the Board's rubric, "reasonable cause" to believe a violation of Section 8(b)(4)(D) has occurred is demonstrated when a finding is made that there are "competing claims to disputed work between rival groups of employees and that there is reasonable cause to believe that a party has used proscribed means to enforce its claims." *Chicago and Northeast Illinois District Council of Carpenters (Millennium Construction)*, 336 NLRB 1002, 1003 (2001).

To satisfy the first part of the analysis, the Board has found that one group of employees performing the work is evidence of a claim to that work by those employees. *Operating Engineers Local 926 (Georgia World Congress Center)*, 254 NLRB 994, 996 (1981).

In addition to testimonial evidence to be presented at a hearing, the evidence that the employees of Countryside are currently performing the work can also be found in a variety of letters between the parties. The evidence that that there is reasonable cause to believe that Respondent used proscribed means to enforce its claims the work of brick paving work can be found by looking at the progression of events. Beginning with Respondent's correspondence on March 24, 2008, it explicitly called on Ragnar Benson to remove Countryside from the job site and requested payment in lieu of work performed by Countryside for brick paver installation. Next, attorneys representing

---

[5] This is even true when, as here, no current picketing is ongoing but where it may be renewed. *Terminal Freight Handling v. Solien*, 444 F2d 699 (8th Cir. 1971).

[6] *NLRB v. Denver Building & Construction Trades Council*, 341 U.S. 675 (1951); *Polish National Alliance v. NLRB*, 303 U.S. 452 (1944); *Siemons Mailing Service*, 122 NLRB 81 (1958).

Respondent followed up with a letter dated April 18, 2008, and warned Ragnar Benson of its "concerns" that Ragnar Benson "may be planning to subcontract certain covered work to a non-signatory entity called Countryside Landscaping...." Then, on April 22, 2008, Respondent filed a grievance against Ragnar Benson seeking the work, or compensation in lieu of the work. However despite information from Ragnar Benson that it did not hold the contract for the brick paving work, Respondent began its picketing at The Arboretum situs, just days after Countryside began work on the property.

Having accomplished its illegal goals, Respondent ceased picketing after only one day of picketing, May 19, 2008, because Countryside was immediately removed from the property by Ragnar Benson. Although no picketing has commenced since Countryside has returned to complete some assignments, Respondent has since given no assurances that it will not return to commit the same unfair labor practices. Such a strong showing of the facts demonstrates that Petitioner can easily withstand the "reasonable cause" standard imposed by the Court.

In its Memorandum in Opposition to the Board's Petition for Injunction, Respondent argues that after it learned from Ragnar Benson that its grievance was non-meritorious because Ragnar Benson did not hold the contract to perform the brick paving work, Respondent was then free to come up with an alternate means of picketing. In this case, Respondent contends that it chose to picket for area standards after finding out that Countryside was not paying standard wages to employees. However, such an argument misses the mark in several respects. First, Section 8(b)(4)(D) of the Act prohibits labor organizations from picketing employers where *an* object of such picketing is to force or require an employer to assign particular work to employees in a particular labor organization, trade, craft or class, rather than to employees in another labor organization, trade, craft or class. Here, the evidence that the picketing was to force the reassignment of the work from employees of Countryside to members of Respondent is copious. In this case, there are several letters evincing a desire for the work, the grievance itself, and the timing of the picketing, which was just a short time after finding out that the work was not within Ragnar Benson's control. Of that entire litany, the Board has found that filing the grievance alone, when combined with picketing, demonstrates an illegal object. *Electrical Workers Local 363 (US Information Systems)*, 326 NLRB 1382, 1383 (1998);

*Plasterers Local 502 (PBM Concrete)*, 328 NLRB 641, 643 (1999); *Capitol Drilling*, 318 NLRB 809, 811 (1995). As these cases demonstrate, the Board views the grievance itself as representing a claim for the work and never concerns itself with the strength or weakness of the grievance. In other words, in the Board's view, the grievance demonstrates the Union's desire for the work and nothing more.

Yet beyond the grievance itself, the Board has been convinced that an illegal object of the picketing can be found when considering with the timing of picketing. *Chicago and Northeast Illinois District Council of Carpenters (Millennium Construction)*, 336 NLRB 1002, 1003 (2001)(finding that the picketing commencing just one day after visiting the site constitutes a violation). As has been shown, Petitioner has a multitude of evidence that the Board regularly relies upon to find a violation of Section 8(b)(4)(D). Respondent misses the mark by assuming that Petitioner is relying upon the grievance alone and by failing to view the grievance as a demand for work.

Despite Respondent's suggestion in its Memorandum, this is not a case of first impression. The Board has consistently addressed arguments to the asserted by Respondent and has routinely found these arguments unpersuasive. For example, in *International Brotherhood of Electrical Workers, Local 134 (Pepper Construction)*, 339 NLRB 124 (2003), the Board stated:

> Although the message on the Union's picket signs was couched in area standards language, the evidence adduced at the hearing and summarized above indicates that *an* object of the picketing was to obtain the assignment of the disputed work. IBEW made clear to Pepper that it considered the alarm work to be IBEW work, that it did not want CWA on the job, and that it would not permit ASN to work on the site. Even after assurances that ASN would meet area standards, IBEW picketed the site. In these circumstances, we conclude that there is reasonable cause to believe that one object of the picketing was to obtain the work for IBEW-represented employees. *Id.* at 125.

As here, the Board found that there was evidence of competing claims for work, followed by picketing, and thus found there was reasonable cause to believe a violation of Section 8(b)(4)(D) had occurred. The Board has consistently found this true, despite signs that indicate that the picketing is for area standards. In short, all that need be shown is that an object of that picketing was designed to attempt to force the reassignment of work because "[o]ne proscribed object is sufficient to bring a union's conduct within the

ambit of Section 8(b)(4)(D)." *Plumbers Local 305 (Abington Constructors)*, 307 NLRB 1048, 1049 (1992).

Also incorrect is Respondent's contention in its Memorandum that *Betal Environmental Corp. v. Local Union 78,* 162 F.Supp 2d (S.D. N.Y. 2001) supports its position for picketing for area standards. That case concerned a suit for damages brought under Section 303 of the Act. The Court declined to reach the issue of whether the union in that case had violated Section 8(b)(4)(D), but decided the case based on causation: "Even if this court assumes that Local 78 violated sections 8(b)(4)(B) and 8(b)(4)(D) of the LMRA, Betal has failed to show that these violations caused Betal's injuries." *Id.* at 260. Thus Respondent's recitation that the case stands for the proposition that its area standards picketing is lawful is unfounded.

Respondent reliance is similarly misplaced relying on *Blyer v. New York Coat, Suit, Dress, Rainwear and Allied Workers Union*, 522 F.Supp 723 (S.D. N.Y. 1981). The union in that case began picketing to obtain a garment industry jobber's agreement, which is permitted under Section 8(e) of the Act. Thereafter, the employer attempted to thwart the picketing union by signing a contract with a different union, thereby creating a work-assignment dispute. The Court reasoned that the Section 8(e) proviso, which expressly countenanced the picketing for a jobber's agreement, could not be negated by employers in that manner. *Id.*, 522 F.Supp at 728 ("Section 8(e) should be read into Section 8(b)(4)(D) at least to the extent necessary to preclude employers from enlisting rival unions to vitiate the protection established by Congress in the garment-industry proviso.") The instant case does not arise in the garment industry, so that proviso does not apply, and the factual situation here is obviously different. Based upon the inapplicability of facts and analysis, it certainly does not justify Respondent's picketing where an object is to force the reassignment of work from one employer to another.

Lastly, careful reading of *Hoeber v. Local 30, United Slate, Tile & Composition Roofers, Damp and Waterproof Workers Association, AFL-CIO*, 939 F.2d 188 (3rd Cir. 1991) demonstrates that our facts herein differ vastly. In *Hoeber*, the Third Circuit refused to reverse the district court's refusal to enjoin a union that was attempting to litigate a breach of contract case against an employer for compensation in lieu of work. In this case, Respondent has admitted that it has abandoned its grievance against Ragnar

Benson seeking that same type of claim. However, it continues to picket in an attempt to obtain the work unlawfully or damage the innocent parties involved. The court in *Hoeber* clearly was not addressing similar issues and thus the precedent is inapplicable.

Petitioner respectfully submits that it will be demonstrated that reasonable cause exists to believe that Respondent's conduct violated the Act.

IV. INTERIM INJUNCTIVE RELIEF IS "JUST AND PROPER" IN THESE CIRCUMSTANCES

There are four elements the court must evaluate to determine whether an injunction is "just and proper." *Kinney v. IUOE Local 150*, 994 F.2d 1271 (7th Cir. 1993): 1) the likelihood that the petitioner will succeed on the merits; 2) whether the petitioner has an adequate remedy at law and/or would be irreparably harmed if the injunction did not issue; 3) whether the threatened injury to petitioner outweighs the threatened harm an injunction would inflict on Respondent; and 4) whether the granting of a preliminary injunction serves the public interest. *Kinney v. IUOE Local 150*, 994 F.2d at 1275.

As noted above, the Petitioner has "reasonable cause" to believe that Respondent's conduct is violative of Section 8(b)(4)(D) of the Act, and thus, a reasonable likelihood of success on the merits exists. That the petitioner does not have an adequate remedy at law and that parties to this dispute would be irreparably harmed if the injunction did not issue can also be shown herein. Here Respondent deliberately attempted to force the reassignment of work from Countryside to Ragnar Benson. This conduct is clearly the kind intended by Congress to be enjoined by the Court under the "just and proper" criteria established by the Act for the Court's exercise of its functions. Congress recognized that to allow actions, like those of Respondent, which stopped an entire construction site by picketing to force the reassignment of work, is disruptive to commerce. The schematics of 8(b)(4)(D) demonstrate that one of the Act's valid concerns is that Respondent may achieve its unlawful object of forcing the reassignment of work or force others to cease doing business with Countryside before the Board can resolve the case. In short, there is no remedy at law to force Respondent to comply with 8(b)(4)(D) other than by pursuing an injunction.

The failure to grant an injunction would cause irreparable harm to Countryside, Ragnar Benson, and The Arboretum as well as the countless other contractors on the

project. As will be demonstrated, irreparable harm can be demonstrated by the loss of reputation to the parties involved. Specific to Countryside, Ragnar Benson, and The Arboretum, each will testify that this picket line has signaled to current and future clients that these businesses are somehow to blame and are not running a legitimate worksite. This in turn affects their ability to attract future jobs. Each will also testify that if the illegal picketing continues, they will continue to suffer in the eyes of public officials who have expressed doubts about their business practices vis-à-vis this dispute. Lastly, there is the impression on the public and the public that passed by this picket line. The Arboretum will testify that the damage to the reputation of the shopping center from this type of public relations debacle could take years and millions of dollars of advertising and marketing to reverse that public perception.

      As testimony will demonstrate, Countryside, Ragnar Benson and The Arboretum have suffered a loss of time because of the illegal picketing, something that cannot be repaid. When Countryside was picketing, Ragnar Benson had about 15 managerial employees on site who could not continue their work. This delay also caused a chain reaction of events to the contractors currently on site. After Countryside was removed from the property and work continued, only some work could occur on the jobsite. There were resources such as equipment and materials that could not be allocated. Due to the nature of their work, contractors will testify that time is at a premium, especially in the spring and summer when the construction season is at its busiest. A delay in time due to a shut down of the construction site like occurred after May 19 pushes back everything from future jobs to individual contractor's work. As will be described by Ragnar Benson's Stan Zygowitz, in the time that Countryside spent away from the site, work was delayed by about 15 working days. Most affected were the grading and site electrical contractors who had to slow work down or not work at all because Countryside was not on site to continue its progress.

      The delay also impacted The Arboretum, who will likely have to push back the opening of the shopping center from its original target date of September 8, 2008. This delay in the opening of the retail stores causes the same type of ripple effect. In The Arboretum's case, this causes a delay in terms of the sales and property taxes anticipated. Related of course would be the loss of tenants who may go to other competing centers

instead of The Arboretum which Respondent has chosen not to picket. These factors cannot easily be estimated and thus are the type of irreparable harm contemplated by the statute's creation.

By contrast, the only "harm" done to Respondent, if an injunction were granted, would be to require it to obey the law and cease its deliberate attempts to enmesh neutral employers in its attempts to grab the brick paving work. Any balance of harms must then tip in favor of granting an injunction.

Further, even though Respondent has not sought to picket Countryside since May 19, 2008, the cessation of allegedly illegal conduct does not render a petition for injuctive relief moot. *United States v. W.T. Grant Co.,* 345 U.S. 629, 632-33 (1953); *Hecht Co. v. Bowles,* 321 U.S. 321, 327-28(1944); *In Re Japanese Electronic Products,* 723 F.2d 238, 318 (3rd Cir. 1982). Here an injunction is just and proper because Respondent may resume its picketing at any time. It is this instability that has caused delays and reassignments on the jobsite, even absent the picketing. Further, Respondent continues to assert that its conduct is justified which indicates a tendency to commit future continuing violations as evidenced by their refusal to provide written assurances that it will cease its unlawful actions, pending the resolution of the unfair labor practice proceedings.

As to the fourth element, whether an injunction serves the public interest, Congress has found that the discontinuance of conduct, like Respondent's, pending the disposition by the Board, is necessary to "adequately protect the public welfare which is inextricably involved in labor disputes." (S. Rep. No. 105, 80th Cong., 1st Sess., p.8). "When Congress itself has struck the balance [between conflicting public interests] a court of equity is not justified in ignoring the pronouncement under the guise of exercising equitable discretion." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 609-10 (1952). "And the proper working of the scheme fashioned by Congress to determine industrial controversies fairly and peaceably demands that the courts quite as much as the administrative body act as Congress has required." *NLRB v. Bradford Dyeing Assn.,* 310 U.S. 318, 343 (1940).

Additionally, as mentioned above, there is also the harm to the public which can be demonstrated by the impact to the Village of South Barrington. In addition to the potential loss of tax revenues not collected if The Arboretum does not open on time, there

are over $4 million worth of road improvements anticipated in the Village of South Barrington that will be delayed if Respondent's picketing is not enjoined. Without an injunction, the delay to these roads will increase traffic and cause signal disruptions around this job site and around the municipality.

Lastly, there is the more ephemeral loss that will occur if Respondent learns that it can ignore the statutory proscription delineated in Section 8(b)(4)(D). If not enjoined, Respondent can benefit from the economic pressure being applied from its illegal picketing while the Board deliberates. This delay will result in either obtaining the work for its members by force, or injury to the innocent parties involved. This signals to the entire labor community that Section 8(b)(4)(D) is without teeth and illegal picketing will occur at a much greater rate throughout the area. Thus the public harm is the lawlessness that will occur without an injunction.

In short, by the facts as outlined above, Petitioner will demonstrate that an injunction is just and proper in that there is the likelihood of success on the merits; there is no adequate remedy at law and irreparably harm has occurred and will continue if the injunction is not issued; the injury to petitioner outweighs the threatened harm an injunction would inflict on Respondent; and the granting of a preliminary injunction serves the public interest. *Kinney v. IUOE Local 150*, 994 F.2d at 1275.

V.  CONCLUSION

For the foregoing reasons, it is respectfully submitted that the Court should grant the relief prayed in the Petition herein.

DATED at Chicago, Illinois, this 24th day of June, 2008.

*/s/ Brigid Garrity filed electronically*
Brigid Garrity, Attorney for Petitioner
National Labor Relations Board, Region 13
200 South LaSalle Street, Suite 900
Chicago, IL 60604
Phone: 312-353-5564
Fax: 312-886-1341

H:\R13COM\Litigation Holds\13-CD-773\DCT.13-CD-773.psuppbrief.doc

## CERTIFICATE OF SERVICE

The undersigned hereby certify that true and correct copies of the Petitioner's Memorandum in Support of Temporary Injunction Under Section 10(l) of the National Labor Relations Act, have, this 24th day of June 2008, been served in the manner indicated upon the following parties of record:

<u>Certified Mail</u>

Laborers Union, Local 118
2430 East Rand Road
Arlington Heights, IL 60004
ATTN: Mr. Martin Flanagan

Law Offices of Marc Pekay
30 North LaSalle Street, Suite 2426
Chicago, IL 60602
ATTN: Marc Pekay, Esq.

Countryside Industries, Inc.
29947 North Rand Road
Wauconda, IL 60084

Littler Mendelson
200 North LaSalle Street, Suite 2900
Chicago, IL 60601
ATTN: David Christlieb, Esq.

The Arboretum
400 Skokie Boulevard, Suite 405
Northbrook, IL 60062
ATTN: Jonathan K. Payne

Bryan Cave, LLP
161 North Clark Street, Suite 4300
Chicago, IL 60601
ATTN: Mr. Jules Crystal, Esq.

Ragnar Benson Construction LLC
250 South Northwest Highway
Park Ridge, IL 60068

Hinshaw & Culbertson
221 North LaSalle Street, Suite 300
Chicago, IL 60601
ATTN:  Thomas Y. Mandler, Esq. and Scott M. Gilbert, Esq.

International Union of Operating Engineers, Local 150
6200 Joliet Road
Countryside, IL 60525
ATTN: Stan Simrayh

International Union of Operating Engineers, Local 150
Legal Department
6140 Joliet Road
Countryside, IL 60252
ATTN: Bryan Diemer, Esq.

International Brotherhood of Teamsters, Local 703
300 South Ashland Street, Room 502
Chicago, IL 60607
ATTN: Tom Steedy

*/s/ Brigid Garrity, filed electronically*
Brigid Garrity
Counsel for Petitioner
National Labor Relations Board, Region 13
209 South LaSalle Street, Suite 900
Chicago, Illinois 60604
(312) 353-5564

H:\R13COM\Litigation Holds\13-CD-773\DCT.13-CD-773.MEMCERT.doc